144 N.J. Super. 365 (1976)
365 A.2d 723
CUMBERLAND COUNTY WELFARE BOARD, A NEW JERSEY CORPORATION, PLAINTIFF,
v.
PABLO RODRIQUEZ, CANDIDA RODRIQUEZ AND IRWIN KAVESH, DEFENDANTS. CUMBERLAND COUNTY WELFARE BOARD, A NEW JERSEY CORPORATION, PLAINTIFF,
v.
CONNIE LeANN D'AMORE, AN INFANT BY HER GUARDIAN AD LITEM, LETITIA D'AMORE, AND LETITIA D'AMORE, INDIVIDUALLY, DEFENDANTS. CUMBERLAND COUNTY WELFARE BOARD, A NEW JERSEY CORPORATION, PLAINTIFF,
v.
GEORGE H. JOHNSON, GWEN MOSELY, AN INFANT, BY HER GUARDIAN AD LITEM, CORNELIUS JOHNSON, AND CORNELIUS JOHNSON, INDIVIDUALLY, LAVERNE SAPP, AN INFANT, BY HER GUARDIAN AD LITEM, ESSIE SAPP, AND ESSIE SAPP, INDIVIDUALLY, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided October 4, 1976.
*369 Mr. Robert E. Bailey for plaintiff.
*370 Mr. Gerald J. Batt for defendants Pablo Rodriquez and Candida Rodriquez (Messrs. Lipman, Antonelli, Batt & Dunlap, attorneys).
Mr. George H. Stanger, Jr. for defendant Letitia D'Amore (Messrs. Serata & Stanger, attorneys).
Mr. Michael Vannella, guardian ad litem for infant defendants Connie LeAnn D'Amore and Laverne Sapp (Messrs. Lipman, Antonelli, Batt & Dunlap, attorneys).
Mr. Connie Pascale, amicus curiae (Camden Regional Legal Services, Inc.).
MILLER, J.C.C., Temporarily Assigned.
Three motions for turnover orders seek to determine the respective right, inter sese, of a county welfare board and persons obtaining monies in their own names or to their use as the result of personal injury claims. In one case the individuals are recipients of monies under the Aid to Dependent Children Program, N.J.S.A. 44:10-1 et seq., and two cases involve the proceeds of personal injury claims approved, on behalf of children, by this court and deposited with the surrogate pursuant to N.J.S.A. 3A:7-14.1.
By order of the court all three were consolidated for argument. A guardian ad litem was appointed for the infants. The court also invited the Public Advocate and Camden Regional Legal Services to participate amici curiae. The Public Advocate thereupon requested Legal Services to act for him.
While the three cases are interrelated and may be discussed within the same frame of reference, each set of facts must be taken separately since the facts in each case present separate facets of the same problem.
In the Rodriquez case the parents were recipients of $15,877 in assistance under the Aid to Dependent Children program from July 1970 to June 1972. On October 9, 1971 *371 an automobile accident occurred wherein the father was injured. On October 14, 1971 the Rodriquezes signed an "agreement to repay" furnished by the welfare board. They then retained an attorney and made a claim under an uninsured motorist coverage, by virtue of which they were awarded $10,000. These funds are presently held in escrow by the attorney retained in the negligence case. Medical expenses in excess of $4,000 were paid by Medicaid, which has a lien for that amount. On July 21, 1976 an order was entered for the Rodriquezes and their attorney to show cause why the welfare board should not be repaid the sum of $5,877.
N.J.S.A. 44:7-19 authorizes county welfare boards to bring court actions to recover money due for assistance to aged persons, from either that person himself or another person responsible for his support. N.J.S.A. 44:10-2 provides that aid to dependent children is to be administered in accordance with "requirements, conditions, limitations and procedures" similar to those in certain sections of N.J.S.A. 44:7-1 et seq., including N.J.S.A. 44:7-19. The section which specifically applies to situations which public assistance is given to dependent children who recover money judgments is as follows:
Whenever any parent or relative with whom a child is living applies for or is receiving assistance for such child pursuant to this act, and it appears that there is pending a payment to the child or to either or both his parents of funds arising from a claim or interest legally or equitably owned by such child or by either or both his parents, the county welfare board may, as a condition of eligibility or continuation of eligibility for such assistance, require such parent or parents to execute a written promise to repay, from the funds anticipated, the amount of assistance to be granted. Upon any refusal to make repayment in accordance with such promise, the county welfare board may take all necessary and proper action under the laws of this State to enforce such promise, and the granting or continuing of assistance, as the case may be, shall be deemed due consideration therefor. [N.J.S.A. 44:10-4(a)]
It should be noted that this statute applies only to situations affecting assistance to dependent children. Any funds *372 received under other programs, such as Aid to Working Poor, are not covered by this statute.
In Francis v. Harris, 100 N.J. Super. 313 (Law Div. 1968), aff'd 103 N.J. Super. 440 (App. Div. 1968), there was a discussion of the validity of this statute. In Francis a minor was hit by an automobile and thereafter was awarded a judgment for $8,000 which was paid from the Unsatisfied Claim and Judgment Fund. The child's attorney was appointed "guardian for the limited purpose of preserving, maintaining and disbursing the funds." The accident occurred on September 21, 1962. On November 21, 1962 his grandmother, as his guardian, signed an agreement to repay to the county welfare board the funds anticipated from the claim arising from the accident. On December 1, 1962 the child began to receive public assistance under the statute. The court discussed the validity of the repayment statute, pointing out that while there are certain guidelines for the receipt of federal funds for such programs, the states are given wide latitude in the organization and administration of the programs. Differences exist among the states' requirements for repayment. Our New Jersey Legislature adopted a policy calling for repayment of funds and establishing the procedure to be followed. Administrative regulations have been promulgated in accordance with statutory authority granted by N.J.S.A. 44:10-3. These regulations require that a pending uncollected tort claim vested in a dependent child should not affect the amount of assistance a child receives, but when the claim is collected it should be regarded as a source of repayment for public assistance granted during the pendency of the claim. Any funds remaining are to be considered in determining the child's need for public assistance. The court determined that reimbursement was the legislative policy and found that reimbursement subsequent to a valid repayment agreement was proper.
The Appellate Division has also considered whether an infant can be required to repay welfare funds when no repayment agreement has been signed. In Essex Cty. Welfare Bd. *373 v. Hellams, 98 N.J. Super. 181 (Law Div. 1967), aff'd 103 N.J. Super. 438 (App. Div. 1968), the court held that when no repayment agreement had been signed, the county welfare board could not recover funds received by a minor as a result of settlement of a personal injury claim.
The Rodriquez case involves an adult signing a repayment agreement under N.J.S.A. 44:10-4. Under Francis, supra, it seems clear that such agreements are valid, and under the statutory policy set forth by the Legislature, repayment agreements should be enforced by the courts. However, the Appellate Division in Essex Cty. Welfare Bd. v. Hellams, 103 N.J. Super. 438, 439 (App. Div. 1968), stated that "The provisions of N.J.S.A. 44:7-19 authorizing the Welfare Board to bring appropriate action to recover moneys due for assistance given any person, insofar as assistance given a dependent child is concerned, must be read with the provisions of N.J.S.A. 44:10-4." N.J.S.A. 44:10-4 requires that a repayment agreement be signed. If such agreement is not signed, there can be no recovery by the welfare board for assistance granted while the claim is pending.
In the Rodriquez case, they signed on a repayment agreement October 14, 1971, in which they promised "to repay the county welfare board for that portion of any assistance so granted which may be paid during the period pending my/our receipt of certain funds which are anticipated by the virtue of a claim or other action against Jerry Spall arising out of accident which occurred 10/9/71."
It should first be noted that the agreement covers only funds received pending the outcome of the action. This is in accordance with the provision of N.J.S.A. 44:10-4(a) regarding a promise to repay "from the funds anticipated, the amount of assistance to be granted." Therefore, if the validity of the agreement be assumed, the only money which could be recovered by the welfare board would be that money received by the parents subsequent to October 14, 1971 and prior to June 1972, when the parent stopped receiving assistance under the Aid to Dependent Children program.
*374 Doubts present themselves as to the validity of the repayment agreement. In Francis v. Harris, supra, the agreement included specific references to the claim "against State of New Jersey Unsatisfied Claim and Judgment Fund, A.S.R. 25225-N, Code W, arising out of an accident involving Vernon Witt who was hit by an automobile on 9/21/62," 100 N.J. Super. at 315. There was no claim that the accident was incorrectly identified or that the child's grandmother did not understand the substance of what she was signing. The facts differ in this case. Here the statement was made by completing a form produced by the county welfare board. The completed form incorrectly identified the defendant in the potential claim as "Jerry Spall" while the defendant in fact was Domingo Cortez. The body of the agreement refers only to the male plaintiff, although both plaintiffs signed the paper. Singular and plural alternative wordings were not crossed out to make the form read correctly. There are serious questions about the parents' ability to understand English, and the court cannot determine whether they understood what they were signing. Defendants' attorney in this case has suggested that the form may not have been filled in until after the paper had been signed. As long as doubts as to these facts exist, it is difficult to determine that the agreement is, in fact, valid.
The welfare board may not recover the money paid to the parents under Aid to Dependent Children from July 1970 to October 14, 1971 since that money was paid prior to the accident and before the claim was pending. The court cannot determine that the agreement to repay money given as assistance is valid, and therefore must also deny recovery as to that assistance granted from October 14, 1971 to June 1972.
In the D'Amore case a child and parent have been recipients of $6,121 under the Aid to Dependent Children and Aid to Working Poor programs from June 1972 to the present. They have also received $372 in Medicaid Assistance. On June 30, 1975 there was a judgment entered in favor of *375 the child and the mother. Under this judgment $372 was to be paid to the treasurer and $47.30 was to be paid to the hospital; $115 was to be paid to the physician; $2,506.35 was to be paid to the welfare board as a partial repayment for a statutory lien under Case No. Y/P-6731. The mother recovered $4,993.65. Attorney's fees were provided. The judgment provided that $2,506.35 was to be deposited in the surrogate's account under the name of the child's mother and the surrogate. In the accident recovered for, the child had lost part of a finger. The money in the surrogate's account was to be used for plastic surgery for the child when her hand had developed sufficiently. The judgment had been agreed to by the welfare board's attorney, but was later disapproved by officials in Trenton.
In this action the board asks that the money in the surrogate's account be released to the guardian to be used for the health, education and welfare of the child and/or to turn over the money to the welfare board "so that the child may remain on the welfare roles. [sic]." It has not asked for repayment of moneys given to the child pending receipt of a claim pursuant to a repayment agreement as provided for under N.J.S.A. 44:10-4. Instead, it has asked for either the use of the money to provide for the child's health, education and welfare or alternatively to turn the money over to the welfare board and then to keep the child on the welfare roll. What is basically requested from this court is to release the funds in the account and thereby to allow the welfare board either to consider the released money when determining the need for financial assistance to the child under N.J.S.A. 44:10-3 or to give the money to the welfare board as a type of prepayment for money to be given to the child.
If the welfare board had asked for repayment under N.J.S.A. 44:10-4, it would not have been able to recover. As discussed heretofore, a valid agreement to repay assistance given is needed for such recovery. The only agreement signed by the father and mother was "to comply with welfare regulations *376 and to pursue all possible avenues to settle the matter concerning the possible surrendering of the trust fund for your daughter, Connie E'Amore [sic] as an available resource to be considered with your eligibility." This was dated January 9, 1976. This is clearly not an agreement to repay any assistance in compliance with the statute; and, without an agreement to repay assistance granted, the board cannot recover repayment for such assistance. Essex Cty. Welfare Bd. v. Hellams, 98 N.J. Super. 181 (Law Div. 1967), aff'd 103 N.J. Super. 438 (App. Div. 1968).
One type of relief requested by the welfare board  that of releasing the funds in question to the welfare board and then allowing the child to remain on the welfare rolls  is clearly not authorized by statute. N.J.S.A. 44:7-19 authorizes the board to bring actions to "recover any sum of money due for assistance given any person." There is no provision authorizing prepayment of funds. For purposes of Aid to Dependent Children programs this provision must be read in conjunction with N.J.S.A. 44:10-4 which requires that a valid repayment agreement be signed while the claim is pending. Essex Cty. Welfare Bd. v. Hellams, supra, 103 N.J. Super. at 439-440.
Under Aid to the Working Poor programs, N.J.S.A. 44:13-9 provides that "any assistance received by a recipient shall constitute a debt owed to the State of New Jersey, which debt shall be recoverable by the State of New Jersey or its agents." As discussed above, this action has not been brought to recover a debt due, a procedure for which statutory authorization exists. There is no statutory authority permitting the welfare board to obtain prepayment for funds not yet disbursed under the Aid to Working Poor program.
The remaining relief requested by the welfare board is to have the funds presently in the surrogate's account released to provide for the health, education and welfare of the child. Such relief would permit the welfare board to take the funds into account when determining financial need and eligibility for assistance.
*377 N.J.S.A. 44:10-3(c) establishes that when need for financial assistance is determined for purposes of receiving aid under assistance for dependent children programs, "there shall be taken into consideration all other income and resources of the dependent child and of the parent, parents, or other relatives with whom such child is living * * *." The issue thus becomes whether the money retained in the surrogate's account is to be considered as income or resource.
If the funds from a personal injury action, in a case such as this, were to be considered in determining eligibility for assistance, it would seem unreasonable that the Legislature would have included a conflicting provision regarding the procedure used by the board to gain control of such money. N.J.S.A. 44:10-4 deals specifically with repayment of such funds, and provides that the welfare board may require promises to repay the board for assistance granted. Without such agreement, repayment may not be required. Essex Cty. Welfare Bd. v. Hellams, 103 N.J. Super. 438 (App. Div. 1968). The Legislature established the specific provisions which protect these funds. It would be unreasonable to find that the same Legislature which required a strict procedure to be followed to allow the welfare board to be repaid intended the board to include the money from such judgment as "income" or a "resource" in determining eligibility.
Even apart from the conflict in legislative policy which would seem to result if these funds were to be considered "income" or "resources," it is difficult to see how this money could be considered as a resource of income which should provide for the child's necessities of life. If the money is a "resource," it is merely a substitute for the child's original "resource," part of a finger. Before the accident the child's finger would not have been considered as a "resource" in determining eligibility. The money at issue here is only part of the judgment recompensing the child. It was intended to be set aside for plastic surgery when the child's hand developed sufficiently to make such surgery possible. If the court allows the money in this account to be used for the *378 child's necessities, it would deprive the child of the medical treatment which was provided for in the original judgment. Surely, this was not what the Legislature intended by "income" or "resource." This must rather be considered a part of the child's body, a "resource" not included in determination of welfare benefits.
N.J.S.A. 44:13-8 establishes the criteria for computing the amount of assistance to be granted under Aid to Working Poor programs. The amount is based on a percentage of this amount established for Aid to Dependent Children with certain deductions. One deduction is for income of employed parents and children unless excluded under N.J.S.A. 44: 13-3(b). That provision specifically exempts from consideration income to minor children under 18 years of age who attend an educational institution. The court does not find that the money at issue here should be considered "income," but does conclude that even if the money was considered to be "income," it could not be included in determining the amount of money which is to be granted under the Aid to Working Poor program.
For purposes of this case, the court need not reach the constitutional issue of whether a child's parent has the right, absent court approval, to sign an agreement authorizing the repayment of money from a fund belonging to his child. It is highly questionable whether a child's rights to his own property may be abrogated without affording it basic due process rights, including notice and opportunity to be heard. The law is clear that unless he has been appointed guardian "a parent has no authority * * * to compromise or release claims or causes of action belonging to the child." Loesch v. Vassiliades, 17 N.J. Super. 306, 309 (App. Div. 1952). In the present case the child's claim had not been released, but the funds from that claim had been promised by the child's parents to another party, creating a somewhat parallel situation. A parent cannot sign an agreement releasing a party from responsibility for a child and indemnifying that party *379 from claims for that child, because the interest of parent and child might come into conflict. Fitzgerald v. Newark Star Ledger, 111 N.J. Super. 104 (Law Div. 1970).
The interest of parent and child in signing an agreement to repay potential funds in order to obtain money for necessaries may or may not be the same. Only the court has the power to insure that the child's rights have been protected because these monies are deposited in a surrogate's account pursuant to N.J.S.A. 3A:7-14.1. (Equivalent money held in a private attorney's trust account must also be subject to court supervision as the attorney is acting as an officer of the court.). That money may be taken in a proper case to pay the welfare board pursuant to a valid repayment agreement. The court at that time may then determine if the child's interests were jeopardized in signing of the agreement. In determining whether to release the money to repay the welfare board, the court should consider several issues. Is the potential claim a result of an inheritance? Is it from a casual source, such as a lottery? Or is it a result of a personal injury? If the money is a result of compensation for personal injury, it nearly always represents money and compensation for pain and suffering, or permanent injuries which generally involve diminution in the wholeness of the individual. The court should also consider whether medical treatment is finished. In a case such as this, where the child may use the money to receive medical treatment in the future, the court should be especially reluctant to use the money to repay the welfare board.
For these reasons, the court denies the welfare's board's request in the D'Amore case to release the money held in the Surrogate's account.
In the Sapp case the child and her mother have received money assistance since 1965 under the Aid to Dependent Children program. On December 8, 1975 there was a judgment for $1,731.27 entered for the child in a personal injury action. The money was placed in the surrogate's account in the name of the child and her mother. The welfare board requests *380 that the funds be placed with the legal guardian and/or transferred to the welfare board so that the child may remain on the welfare rolls.
The accident from which the personal injury action arose occurred on February 17, 1973. There were two documents labelled "Agreement to Repay" signed by the minor's parents. Both were on standardized forms provided by the welfare board. The body of the agreement was printed with blanks left for the names and addresses of the persons making the agreement, the name of a party against whom there was a potential claim, the circumstances surrounding the claim, signatures of persons making the agreement, signatures of witnesses and the date.
The first agreement had blanks filled in giving the names, addresses and signatures of persons making the agreement, the signature of a witness and the date. There was nothing written in the blanks for parties against whom there was a potential claim or the circumstances surrounding the claim. It was dated August 18, 1969  3 1/2 years before the accident. The second form only had the signature of the persons making the agreement and a witness. There was no date.
There were not valid repayment agreements under N.J.S.A. 44:10-4(a). The board is authorized to require such agreements when "it appears that there is pending a payment * * * from a claim or interest legally or equitably owned by such child * * *." In this case a blank form was signed when there was no pending claim. Hence, they cannot be considered valid repayment agreements as required by N.J.S.A. 44:10-4(a). Therefore, the welfare board may not be permitted repayment for assistance granted during pendency of the claim.
The board here, as in the D'Amore case, is asking for release of funds to provide for the health, education and welfare of the minor and/or transfer of the funds to the welfare board so that the minor can continue to receive assistance.
*381 This case involves only the Aid to Dependent Children program. As discussed above, the board cannot take control of the funds and keep the minor on the welfare rolls. There is no statutory authorization for this type of prepayment arrangement.
The board also asks the court to release the money to provide for the health, education and welfare of the minor. As discussed above, the Legislature has established a procedure for welfare boards to obtain control of such funds. A judgment in a personal injury action cannot be considered income; rather, it must be considered a substitution for wholeness of body. The child's health is not a resource considered by the board in determining whether or not to give assistance. If the board is to recover money from such judgments, it must follow the procedure established by the Legislature in N.J.S.A. 44:10-4(a). Therefore, in the Sapp case the court denies recovery to the board of moneys held in the surrogate's account.
In each case herein, the court having denied relief to the board, the board is directed not to consider any of the funds discussed as a "source of repayment for public assistance granted", and is further directed not to remove any party hereto from welfare benefits of any type by reason of the existence of these funds.
The results in these cases suggest procedures which should be taken by welfare officials in the future if they are to be entitled to repayment of funds expended pending receipt of money from a judgment by a recipient of funds under the Aid to Dependent Children program. With respect to both adult and minor recipients of funds, welfare officials should ensure that persons signing such repayment agreements understand what they are signing. If the recipient has difficulty with the English language, the board must take care that an interpreter is provided to communicate accurately the contents of the agreement to the person signing it. The agreement cannot be a form signed in blank at some time before the cause of action for which the claim *382 arose occurs. The cause of action must be described accurately and completely enough to allow the recipient to know exactly what funds he is agreeing to repay to the welfare board.
The cases call for a delicate adjustment of the rights of society on the one hand and of the infants to retain for their future use some portion of the funds, which may well be later expended for future medical, surgical or prosthetic services. All of these represent, not the windfall of the traditional rich uncle's death, or, more prosaically, a winning ticket at the track, but awards for pain, suffering or permanent injury. In this respect the situation is clarified by bearing in mind the types of recovery now permitted under the "No Fault" statute, N.J.S.A. 39:6A-1 et seq.
Our affluent, yet cost-conscious, society need not yet go so far as to demand from an impecunious infant the sacrifice of, say, a leg. It likewise ought not require of him that he turn over to it monies awarded him in compensation for the sacrifice of that same leg. And it makes equally little sense to divest such an infant of monies recovered and set aside for future surgery, while thereafter expecting society to pay for that same surgery through Medicaid or similar funding. Like all governmental action, this one must be administered with common sense and a sensitivity to the delicate interplay of the fundamental underlying factors.
In summary, the following principles apply:
(1) No reimbursement may be had unless a valid agreement under N.J.S.A. 44:10-4(a) is signed.
(2) Such agreements may not, under the statute, be signed either in blank or for use in futuro.
(3) No agreement signed by a parent or guardian may be enforced except with the approval of the court, and the court will examine each case on an ad hoc basis to approve or disapprove of such payment.
(4) It is obviously impossible to predict the actions of the court in such cases, but the following factors may well be persuasive:
*383 (a) Items of real wealth such as inheritances, windfalls or other similar items should be available for the use of the board.
(b) Monies received as compensation for permanent injuries will be jealously guarded since they represent the compensation for a diminution of the whole person. While it is conceivable that a turnover might be directed in some cases, it ought to be done sparingly.
(c) Monies representing the cost of future medical treatment of prostheses will not be subject to a turnover order but will likewise not be turned over to the infant except for such purposes. In this respect the court may well consider the directing of the impounding of such funds beyond the infant's attaining majority. By reason of the fact that if the infant does not pay for such treatment out of the funds made available to him for that purpose, society will have to, the State has sufficient interest so as to justify the freezing of such funds and to prevent the infant from squandering them.
(d) The proper procedure in each case is for either the board or the infant to apply to the court, on notice to the other, in an order to show cause.
(e) The board may not regard such funds as a source of repayment absent a court order.
(f) In dealing with persons who are under obvious disadvantages, including language limitations, such as persons of Spanish heritage, the board must be zealous in its protection of the rights of such persons. A society whose national origins are so diverse and whose historical origins are so inspiring never stands so tall as when it leans down to protect its less fortunate. This becomes the true mark of its greatness and must never be abandoned or lost by default.
An appropriate order may be presented.