*513 OPINION OF THE COURT
Alan C. Marin, J.
Jacqueline Genao brings this action for damages arising from her rape on November 6, 1992, at a time when she was a patient at South Beach Psychiatric Center in Richmond County.
The claim was tried September 8 and 9 of 1997 and January 12 of 1998. Genao testified on her own behalf. She called as witnesses Dr. Lorenzita Dionisio, her treating psychiatrist at South Beach; nurse Gloria Braithwaite; mental therapy aide Harvey Providence; and Dr. Felix Ellis, an examining psychiatrist. The defendant called one witness, psychiatrist Dr. Stephen Weisblatt. The parties submitted briefs by May 1, 1998, as scheduled.
Genao was 20 years of age at the time of the rape, and had a history of psychiatric problems, including several hospitalizations. She was hospitalized at South Beach in 1990 after trying to jump from a window. Other probable suicide attempts include setting the bathroom and her bathrobe on fire, drowning in the bathtub, and choking herself with a cloth while being transported in an ambulance. In 1990, she apparently attacked her father over whether she could leave the house late one night.
In August of 1992, Genao had been admitted to South Beach after she had spoken about suicide, been unable to sleep, had bouts of crying and told of hearing voices. At the time she had been attending the Sunset Park Mental Health Center. After nearly a three-week hospitalization, Genao was discharged on September 9, 1992; the discharge note described her stay as “uneventful”.
On October 31, 1992, Genao, who was “not sleeping well, was walking the streets in [pajamas], and throwing eggs out of grocery stores,” was readmitted to South Beach and assigned to an acute care ward known as SBAU-1 (claimant’s exhibit 5, at 1). The medical staff at South Beach placed the claimant under the standard level of observation which means observing the patient, and so recording, every 30 minutes. The other levels of observation are every 15 minutes and one-to-one, or continuous observation. In addition, there is also a structured treatment unit for patients who are difficult to manage and who exhibit violent behavior.
This time, claimant’s hospitalization time was not uneventful. Her first morning, claimant became agitated, refused to eat *514 and attempted to attack the staff. She was placed in four-point restraint for two hours. On Genao’s second full day at South Beach, November 2, 1992, she was placed in seclusion for striking another patient and in restraints again for shouting and banging on doors and windows. Later that day, she was again screaming loudly and “punching and kicking and was physically threatening to staff and other patients”. Genao was once more put in restraints (claimant’s exhibit 5, at 8, 8A).
Claimant became agitated and disruptive on November 3 and was put in locked seclusion. The next day she was subject to four-point restraint after throwing a chair at staff when she was refused the use of a telephone. On November 5, she hit a staff member in the face and was placed in restraints.
On the day in question, Friday, November 6, claimant awoke at 6:00 a.m. in an agitated state — shouting, banging on doors and unable to follow directions. Genao was administered medication which had a calming effect.
At about 3:00 or 3:30 that afternoon, Genao who was yelling and threatening the staff was given an injection of Haldol and placed for observation in what is known as the quiet room. By that time, lithium, Ativan and Cogentin, as well as the Haldol, had been administered; all but Cogentin can cause drowsiness and/or lethargy. There was no documentation or testimony from the hospital staff as to when Genao was released from the quiet room. The claimant testified that she was tired and sleepy after receiving the Haldol injection, and went to the first empty room on the unit and fell asleep — room 814. Genao’s drowsiness lasted the rest of the day; the emergency room record of Staten Island Hospital, where claimant was taken after the rape, contained the entry that she “sleeps @ intervals” (claimant’s exhibit 12-A).
In theory, a document known as the patient accountability record (PAR), which is intended to record the location of every patient on the unit, subject to the general 30-minute level of observation, would provide evidence of Genao’s whereabouts in the critical late afternoon hours. Testimony was elicited thereon:
“Q. Now, at four o’clock when you came on shift, how did you go about preparing this patient accountability record?
“A. [Harvey Providence, therapy aide] you go around and you eyeball every patient to know where they’re at.” (Trial transcript, at 477.)
Between 4:00 and 6:30 p.m., each of the six entries in the PAR lists claimant as “U”, meaning on the unit. This unit cov *515 ers the area on two floors, other than the quiet room, the first floor dining room (but could include the area just outside the dining room), and the patients’ own rooms or the bathrooms. Providence testified that he would write “U” on the report if he found a patient sleeping in an unoccupied room.
The 4:00 and 5:00 p.m. notations were made by Providence who testified that “I don’t remember knowing her before that time [November 6].” (Ibid.) Moreover, he could not recollect Genao’s location on the unit. Dennis Kennedy, a mental hygiene therapy aide, made the 4:30 p.m. entry. Kennedy, who was not called to testify, was not usually assigned to SBAU-1; nor could nurse Braithwaite recall if Kennedy had ever been assigned there before. Braithwaite made the last three PAR entries before the attack, at 5:30, 6:00 and 6:30 p.m. In contrast to Providence’s testimony, the nurse stated that she did not rely on direct, visual observation: “I go around to the different areas and I check the patients. If I didn’t hear, I called out for the names” (id., at 270). Nor could she recall Genao’s specific whereabouts on the unit for any of the three times.
When the large majority of the unit’s patients went to dinner at 5:30 p.m., Genao was still listed as being in the unit. Providence testified that according to the PAR, Genao had not been at dinner, and he could not explain her absence. Room 814, like the other patient rooms, has no windows. The patient rooms had locks that could only be locked from the outside — by the staff. Obviously, staff members cannot see into room 814 from the corridor; in fact the door to room 814 cannot be seen from the front desk or the chart room, which is utilized for various record-keeping functions.
At 6:45 p.m., Providence heard whimpering in room 814 and discovered claimant in the room. Genao had been raped by John T., another patient.
The most reasonable conclusion to be drawn from the credible evidence is that Genao, supposedly on a 30-minute watch, sleepily wandered into room 814 just before 4:00 p.m., where she remained unobserved by the South Beach staff until some three hours later, following her rape. It is insufficient, in the view of contradictory evidence, to infer a specific fact from the general policy, i.e., Braithwaite testified that she would not allow a patient to sleep in a room that was not assigned to her.
The defendant argues that Dr. Dionisio, who was also John T.’s treating psychiatrist, testified that she was unaware of any prior violent or sexually inappropriate behavior on his part. The defendant’s duty of care to protect Genao extends to *516 various risks that could be anticipated; it extends beyond a danger posed by any particular individual. (See, Miller v Albany Med. Ctr. Hosp., 95 AD2d 977 [3d Dept 1983].) An intervening criminal act does not nullify a defendant’s negligence where such act was itself one of the foreseeable dangers to be guarded against. (Bell v Board of Educ., 90 NY2d 944 [1997].)
The defendant does not concede that a rape occurred. By the fair preponderance of the credible evidence, I conclude that a rape occurred and that such incident was claimant’s first experience of sexual intercourse. On the witness stand, Genao was at times excitable and unfocused; nonetheless, the following narrative was quite credible: “I slept [in room 814] And when I finally woke up * * * I realized there was some — someone on top of me * * * It was [a] man * * * He was covering my mouth. I — I yelled, ‘No, please don’t do it. Stop’ * * * He took off my clothing * * * He pushed me * * * grabbed me. Then against my will, he entered his penis in my vagina. He hurt me very much. I yelled right there. I — I cried. I yelled at him to get off.” (Trial transcript, at 412-413.)
The incident report provides that Genao was found “standing in the room dressed in pajamas top * * * bright red blood running down both legs and bright red spots of blood on the floor” (claimant’s exhibit 1; see also, claimant’s exhibit 5, at 24). The rape test report from Staten Island Hospital indicated “Hymen ring lacerated” (trial transcript, at 327).
The defendant’s own psychiatrist apparently accepted the fact of claimant’s rape:
“Q. Doctor, what conditions were present, if any — .
“A. She had just been raped * * * Clearly the rape was traumatic whether she was virginal or non-virginal. It was clear * * * in her interview that she was upset that her virginity was violated.” (Id., at 816, 839.)
A finding of medical malpractice requires a deviation from accepted medical practice which proximately caused the subject injury. (Fridovich v David, 188 AD2d 984 [3d Dept 1992].) The level of observation for a patient at a psychiatric facility is a determination entrusted to the judgment of medical professionals. (Topel v Long Is. Jewish Med. Ctr., 55 NY2d 682 [1981].) Claimant’s expert psychiatrist, Dr. Ellis, testified that such observation level deviated from proper standards of care, a statement that was contested by Dr. Weisblatt, the defendant’s expert. Doctors Weisblatt and Dionisio testified that when *517 evaluating assignment to the structured treatment unit, the benefit of a greater level of supervision must be weighed against placing the patient in a unit with more aggressive individuals. An analogous balancing occurs in choosing among the three levels of observation — the benefit of closer scrutiny against the loss of independence, responsibility and the opportunity to positively interact with other patients on the unit. There was no medical malpractice in this instance; a difference of opinion, which in hindsight had a profound result, does not constitute malpractice.
However, I find that the defendant was negligent in its supervision of the claimant; it failed to use reasonable care to protect Genao from a not unforeseeable occurrence. I conclude that the defendant did not adhere to its own 30-minute observation level. There is no credible evidence that any staff member of South Beach saw the claimant from 3:30 p.m. until about 6:45 p.m. when they heard her — crying after the rape. Moreover, room 814 should have been locked, hardly a costly or sophisticated security measure. (See, PJI3d 2:10, 2:12.) The defendant is fully responsible; no comparative negligence on the part of claimant has been advanced or suggested. (See, Luce v State of New York, claim No. 85728, Ct Cl 1997, slip opn, at 33-34.)
Damages[1] and the Defendant’s Counterclaim
Claimant was a troubled person prior to November 6, 1992; she was also a troubled person thereafter. Following the rape, she remained hospitalized for another two months, until January 5, 1993. She was subsequently hospitalized on four separate occasions in 1995 for about 100 days.
Prior to the rape, Genao had been diagnosed as suffering from a mental disease known as bipolar disorder with psychotic features. It is a mood disorder that Dr. Weisblatt described as characterized by early onset; it will cycle over time — the normal and manic (or depressive) states will alternate, with the periods of normal behavior becoming shorter.
Dr. Ellis testified that the suicide attempts after November of 1992 were caused by the rape, that subsequent hospitalizations were 75% to 80% attributable to the rape, and that the *518 rape aggravated or exacerbated Genao’s preexisting mental condition, doing so on a permanent basis. He testified that claimant’s permanent low, or lower, self-esteem, hypersexuality and feelings of worthlessness and hopelessness are manifestations of rape trauma syndrome, a conclusion which on cross-examination he revised to posttraumatic stress disorder. Dr. Ellis did state that in cases of rape, the disorder is rarely worked out by the victim within three months, and that Genao’s prognosis is more guarded than it otherwise would have been. She will require treatment therefore on a permanent basis.
Expert testimony on “rape trauma syndrome” has been ruled admissible to explain a victim’s delay in reporting the assault or other behavior. (People v Taylor, 75 NY2d 277 [1990].) The operative standard for our purposes is the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders: DSM IV, commonly known as DSM IV, in which the broader category of posttraumatic stress disorder is not broken down further.
Dr. Weisblatt testified that whatever problems claimant experienced subsequent to November 6 were caused by her preexisting condition. He said that while the rape was “complicating”, it was not “exacerbating” (trial transcript, at 819-820); that postincident hospitalizations would have occurred in any case; and that subsequent suicides were triggered by nonrape connected events such as family arguments. Moreover, according to Dr. Weisblatt, the rape did not cause a fear of sexual relationships in Genao. Dr. Weisblatt also explained that half of all people resolve posttraumatic stress syndrome within three months.
But as indicated above, Dr. Weisblatt stated that the rape had been a traumatic experience. In Dr. Weisblatt’s interview with the claimant, he thought it important enough to include in his notes her distress over the violation of her virginity, although the loss of virginity was not covered in his three-page psychiatric assessment. However, he testified that “in the context of a person having a psychiatric illness, they will preoccupy themselves with whatever state of affairs” fits the mood (id., at 712).
Claimant did not have an employment history; nor was there any testimony adduced as to whether she would have been able to secure employment in the future, but for the impact of the rape experience. Consequently, no award will be made for past or future lost income. In evaluating the evidence with re *519 spect to pain and suffering, I conclude that Genao suffered an extreme trauma on November 6, 1992 and such event exacerbated her existing bipolar disorder, more severely in the short term. I find past damages for pain and suffering in the amount of $200,000 and future pain and suffering damages in the amount of $50,000, for a total of $250,000.
The defendant, through its counterclaim, seeks to reduce the award by $151,318.16, the accumulation of charges for seven separate hospitalizations of Genao in facilities of the State Office of Mental Health.
The authority for such counterclaim rests upon subdivision (a) of section 43.03 of the Mental Hygiene Law, which holds the patient, her estate, or parents or legal guardian, if under 21 years of age, financially responsible for services rendered to the patient. Less precise than a parallel provision of the Social Services Law which explicitly references recovery against personal injury awards (§ 104-b [1]) and a statute, by and large, in derogation of the common-law principle that damages for personal injury are intended to make the injured party whole,[2] section 43.03 was applied in Matter of Carlon v Regan (98 AD2d 544 [3d Dept 1984], affd as mod 63 NY2d 1011 [1984]).
Garlón was arrested on burglary charges in 1944 and then, based upon a court-ordered psychiatric examination, committed to an institution for the criminally insane, Matteawan State Hospital. When his burglary indictment was dismissed in 1966, he was transferred to a civil institution, became a voluntary patient there in 1969 and, from 1978 until the date of the appellate decision, was an outpatient in a supervised private home. Garlón was awarded $125,000 on his negligence and malpractice suit for the 22-year confinement at Matteawan. The State’s counterclaim was for Carlon’s medical care and treatment after his release from Matteawan. The Third Department declared that “[p]ersonal injury awards are subject to the State’s right to recover for services rendered at its mental health facilities”, observing that “the State rendered the services to [Garlón], which, as discussed above, are unrelated to the State’s prior wrong, and by statute the State is authorized to charge fees for those services” (98 AD2d, supra, at 547 [emphasis added]).
Per Carlon (supra), those portions of the $151,318.16 that are unrelated to the rape may validly be used to reduce *520 the award to Genao — namely, all of the fees incurred prior to the rape and the appropriate portion thereafter. For the period of hospitalization occurring on November 6 and immediately thereafter, I find that a high proportion of the care and treatment of Genao is related to the rape — 85%. For the four hospitalizations, some two years later in 1995, the related-care portion is significantly lower; I find that portion to be 20%. The appropriate amount of the counterclaim is $101,237.[3]
Accordingly, the award to claimant is $148,763, which is $250,000 less the counterclaim amount of $101,237. The Clerk of the Court is ordered to enter a judgment on behalf of the claimant in the amount of $148,763. All motions not ruled upon are hereby denied.

. Apparently, no specific amount of damages was set forth in the claim itself. Pursuant therefore to CPLR 3025 (c), inter alia, claimant’s pleading will be deemed amended to conform to the proof at trial.

. See, for example, the discussion in Cumberland County Welfare Bd. v Rodriquez (144 NJ Super 365, 377-378, 365 A2d 723, 730 [1976]).

. From defendant’s exhibit A: the first two lines of the seven rows of figures representing Genao’s seven separate hospital stays are applied 100%; the last four lines 80%; and the third line allocated at 100% for the six days through November 5 and at 15% for the 61 days from November 6 through January 5, 1993: $11,837.04 + $12,879.60 + 6 ($643.98) + .15 (61) ($643.98) + .8 ($29,941.47 + $31,476.93 + $5,276.96 + $16,759.50) = $101,237. As this exhibit demonstrates, the (uncontested) practice is to count the first and last days, so that the hospitalization from June 23 to June 30 generates eight days of the applicable per diem charge.