214 N.J. Super. 615 (1987)
520 A.2d 813
BURLINGTON COUNTY WELFARE BOARD, PLAINTIFF-APPELLANT,
v.
MILDRED STANLEY, DEFENDANT/THIRD-PARTY PLAINTIFF-RESPONDENT,
v.
AUDREY HARRIS, DIRECTOR, DIVISION OF PUBLIC WELFARE, THIRD-PARTY DEFENDANT/APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted December 17, 1986.
Decided January 20, 1987.
*617 Before Judges FURMAN, DREIER and SHEBELL.
Anthony J. Cavuto, attorney for appellant, Burlington County Welfare Board (Daniel T. Campbell, on the brief).
Mathews, Sitzler, Weishoff & Sitzler, attorneys for respondent, Mildred Stanley, (William Emmett Sitzler, on the brief).
W. Cary Edwards, Attorney General, attorney for appellant Audrey Harris (Michael Clancy, Deputy Attorney General, of counsel; Dorothy Donnelly, Deputy Attorney General, on the brief).
The opinion of the court was delivered by SHEBELL, J.A.D.
Plaintiff-appellant, Burlington County Welfare Board, sometimes referred to as "CWA," and third-party plaintiff-appellant, Audrey Harris, Director of the New Jersey Division of Public Welfare, have filed separate appeals from an order for summary judgment in favor of defendant-respondent, Mildred Stanley, dismissing the action of the County Welfare Board for reimbursement of public assistance in the sum of $7,159 received during the pendency of Stanley's lawsuit for personal injuries sustained in an automobile accident. We now consolidate the two appeals. The trial court in a written opinion concluded that neither the reimbursement agreement signed by the defendant nor the procedures used in connection with its execution satisfied constitutional demands and thus the County Welfare Board was not entitled to reimbursement. We reverse.
Mildred Stanley, having only a seventh grade education, began receiving public assistance benefits in January 1969. Stanley was injured in an automobile accident on April 3, 1980 for which she filed suit for damages, but did not inform the Welfare Board of this claim.
*618 For the next twenty-one months, she continued to collect public assistance benefits totaling $7,159, while signing Welfare Board recertifications on three different occasions even though these certifications asked, "Do you or anyone making application have any pending claims, such as lawsuits, sale of property, or does anyone owe you money?" On July 7, 1980 Stanley answered "no," on February 5, 1981 "none," and on July 27, 1981 Stanley left it blank, each time signing the form.
Subsequent to the third recertification, the Welfare Board learned of Stanley's lawsuit through its investigator and requested on October 5, 1981 that she sign an agreement to repay. Stanley had previously signed a similar agreement regarding disability benefits during unemployment following an earlier accident. The text of the agreement pertinent to this case reads as follows:
I, We, (Mildred Stanley) of (2210 Walnut St.) (Mt. Holly, N.J.) for the purpose of receiving assistance for myself (ourselves) and my (our) children, in accordance with New Jersey Statutes Annotated, Title 44, Chapter 10, Assistance for Dependent Children, do hereby promise, in consideration of the granting of such assistance, to repay the County Welfare Board for that portion of any assistance so granted which may be paid during the period pending my (our) receipt of certain funds which are anticipated by the virtue of a claim or other action against (blank) arising out of (accident that took place in April 1980 in Willingboro). I hereby agree, and also authorize and direct by [sic] attorney, if any, to furnish full and complete information to the (Burlington) County Welfare Board, as to the above claim or other action. I agree to keep the Welfare Board informed of any proposed disposition of the claim or other action, and I agree not to dispose of any monies realized from such claim or other action without the prior consent and approval of the Welfare Board. Witness (Maureen A. McGlashon) Signature (Mildred Stanley) (L.S.) Witness (blank) Signature (blank)
Date: (10-5-81)
[(parenthetical information as it appears on form)]
Defendant's caseworker said that according to standard procedure she did explain to Stanley what the form meant, telling her that "[Stanley] would have to repay any assistance that was granted [during the pendency of the claim]...." Stanley then asked the caseworker

*619 what would happen if she didn't. Everybody always asks me, what would happen if I didn't sign it ...
and was told
it would hold up your checks. And I told her that this would be signed because of the lawsuit and it would be referred to the legal department.
The caseworker admitted that she did not specifically inform Stanley that failure to repay would eventually result in termination of benefits. Stanley also inquired
like most people do, how much do I have to repay, and I told her that I didn't  I didn't know; that wasn't my department; it would be referred to someone else and they would let her know.
Stanley however denies that she understood any of these forms, including the recertifications and the agreement to repay. After Stanley completed the forms, Welfare Department personnel would check the forms. However, Stanley claims that she did not sign the agreement to repay. She also states that no one explained that she "would have to pay money back if you had any claim such as an automobile accident ..." nor that the Welfare Department has "a duty to try to get the money back ..." nor that she "had some duty to report to the Welfare Department whenever you had a claim for an accident...." With specific reference to the recertifications, Stanley said she did not know what "pending" meant and did not know that claims included insurance company proceeds.
A form letter was sent to Stanley's counsel on the tort claim on October 23, 1981 "to advise the attorney of the Welfare Board's interest in Mrs. Stanley's law suit." According to the caseworker it included
a copy of the agreement to repay, and I also attach a blank information form asking the attorney to advise us of certain circumstances, the date of the accident, where it occurred, who was injured in the accident, the insurance company, and certain other items. If I don't get an answer from the attorney a short period of time after that, I write to the client asking them to please contact their attorney and ask them to give us the information we need.
Receiving no response, the Board wrote to Stanley on November 25, 1981 "asking her to get in touch with her attorney." On December 17, 1981, the Board sent Stanley official notice of suspension of AFDC benefits for "refusal to comply ..." *620 effective January 1, 1982, which included notice of Stanley's right to appeal at a fair hearing. The Board again wrote defendant's counsel on July 28, 1982 seeking "the current status of the law suit ..." and explaining that "under the statute [N.J.S.A. 44:10-4(a)] no monies could be disbursed without the written permission of the Welfare Board." Thereafter, her counsel requested "[a] copy of any document which gives you a right or lien against any recovery we may get in Mrs. Stanley's personal injury case as well as a copy of the statute authorizing the same...." In reply, the Welfare Board sent Stanley's counsel another copy of the agreement to repay, together with a letter indicating the citation of the relevant statute and reminding counsel that a copy of the agreement had previously been forwarded to him in October 1981. Stanley has not reapplied for public assistance since January 1982 and returned to work in January 1984.
In 1984 Stanley's accident claim was settled for $40,000. On April 13, 1984, the Board sought the advice of the New Jersey Department of Human Services, Division of Public Welfare as to whether the Board could accept "a lesser amount than is due under the Agreement to Repay ... due to Mrs. Stanley's physical and mental condition" and received the reply that
we are unable to find in the material presented any showing of a critical connection of the release to Mrs. Stanley of additional funds from the settlement to her ability to remain self-supporting indefinitely. The establishment of such a relationship would produce a basis for the release.
In the event that the Welfare Board acts favorably on this compromise proposal, we will be pleased to review it again for purposes of the required approval.
Stanley's counsel requested an appearance before the State Welfare Board. Following an appearance before the Burlington County Welfare Board counsel was advised that the County Board "declined to settle for a lesser amount ..." and requested payment in full within ten days. This action was then filed.
The trial court in its written opinion stated that although Stanley's intelligence was "not so demonstrably limited as to prevent [her] understanding [of the agreement], especially in *621 view of the oral explanation provided when the agreement was tendered ...," the agreement was not effective for several reasons. First, the agreement constituted a contract of adhesion because it was drafted without Stanley's participation; had the unilateral effect of binding only Stanley; and the parties were in unequal bargaining positions without Stanley being notified of the effects of, or available alternatives to, not signing. Second, the agreement "presents difficulties with respect to grammar, language and interpretation ...," contravening case law and the Plain Language Act, N.J.S.A. 56:12-2. Third, Stanley would have been better off not signing because under the applicable regulations "[s]he would have become ineligible for assistance but would have lost welfare payments for only the three or four months between October 5, 1981, when she signed the agreement and January 1982 when she last received assistance." Lastly, the agreement and its procedures violate basic principles of due process articulated by the United States Supreme Court in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) and Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), because "Stanley's execution of the agreement, without a full explanation of its consequences [, i.e., that her refusal to sign would have terminated future benefits at once], denied her the opportunity to make a choice as to whether she preferred termination of benefits or some other alternative ..." such as her right to compromise and to a retention of monies for anticipated medical expenses or monies constituting the damage award. Defendant filed a third-party complaint against the Deputy Director of the Burlington County Welfare Board and the Director of the New Jersey Division of Public Welfare for declaratory relief and damages, which was dismissed on motion for summary judgment. Defendant has not appealed from these dismissals. Although third-party defendant Harris was no longer in the case because of the dismissal of the third-party complaint she has appealed without being challenged as to her standing. We assume this is because of the State's possible *622 financial interest in the outcome and because of the important public question involved.
This court must determine if the trial court erred in granting summary judgment under the criteria contained in R. 4:46-2:
The judgment or order sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.
The trial court must determine if there is a "genuine issue as to material fact, but not decide the issue if [the court] finds it to exist." Judson v. Peoples Bank and Trust Co. of Westfield, 17 N.J. 67, 73 (1954). "[T]he absence of undisputed material facts must appear `palpably.' All inferences of doubt are drawn against the movant in favor of the opponent of the motion." Id. at 74-75. An opposing party who offers no substantial or material facts in opposition to the motion cannot complain if the court takes as true the uncontradicted facts in the movant's papers. Id. at 75. If the court finds that no issue of material fact does exist, it then must decide if the movant is entitled to judgment as a matter of law. R. 4:46-2; Millison v. E.I. duPont de Nemours & Co., 101 N.J. 161, 167 (1985).
The substantive law in this case originates in Federal and State statutes governing Aid to Families with Dependent Children ("AFDC"). 42 U.S.C.A. § 601 et seq.; N.J.S.A. 44:10-1 et seq. Though the Federal law contains no express provisions granting general authority to a state to seek reimbursement for overpayments, "it has been suggested that Congress implicitly acquiesced to state recoupment law ... in [42 U.S.C.A. § 603(b)(2)]...." Case Note, Social Welfare, 28 Rutgers L. Rev. 515, 517 n. 13 (1974). Accordingly, State law effective at the time of this case provided:
Whenever any parent or relative with whom a child is living applies for or is receiving assistance for such child pursuant to this act, and it appears that there is pending entitlement to a payment to the child or to either or both his parents of funds arising from a claim or interest legally or equitably owned by *623 such child or by either or both his parents, the county welfare agency may, as a condition of eligibility or continuation of eligibility for such assistance, require such parent or parents, or relative, to execute a written promise to repay, from the funds anticipated, the amount of assistance to be granted from the date of entitlement to such payment. Upon any refusal to make repayment, including refusal by any person acting for or on behalf of such parent or parents, or relative, in accordance with such promise, the county welfare agency may take all necessary and proper action under the laws of this State to enforce such promise, and the granting or continuing of assistance, as the case may be, shall be deemed due consideration therefor. Any payments from the settlement of such claim or interest legally or equitably owned by such child or by either or both of his parents made by any person acting for or on behalf of such parent or parents, or relative, subsequent to notice of claim of the county welfare agency and prior to express written approval by the county welfare agency shall cause such person to be liable to the county welfare agency in the amount of such payment.
........
The county welfare agency may, with the consent and approval of the Division of Public Welfare, compromise and settle any claim for repayment of assistance granted under this act. [1977 N.J. Laws c. 127 at 504-505 (codified as amended at N.J.S.A. 44:10-4(a) and (c))].
This statute includes "a cause of action to recover in tort for personal injuries ..." within the literal meaning of a claim or interest legally or equitably owned. Francis v. Harris, 100 N.J. Super. 313, 318 (Law Div.), aff'd 103 N.J. Super. 440 (App. Div. 1968), certif. den. 53 N.J. 227 (1969). See also In re Estate of Jackson, 79 N.J. 517, 524 (1979); In re Doughty, 160 N.J. Super. 126, 128, 129 (App.Div.), certif. granted 78 N.J. 409 (1978), certif. dismissed 81 N.J. 261 (1979).
Pursuant to this statute, the Public Assistance Manual, N.J.A.C. 10:81, contains certain regulatory provisions under which a threshold condition of properly granted assistance requires "[r]epayment of assistance in the AFDC program ... in certain cases [of pending claims and interests] in which assistance is granted while the recipient(s) awaits receipt of funds from some other source." N.J.A.C. 10:81-3.40. Moreover, an agreement to repay is required under the following circumstances:
The receipt by the CWA of a signed Agreement to Repay is required as a condition of eligibility whenever, and only whenever, there appears to be entitlement to a specifically identified payment other than public assistance to any persons for whom cash assistance in AFDC is being requested or granted, *624 except as indicated in (d) below. For this purpose, a parent's potential entitlement is considered to include potential entitlement by that parent's minor children who live in the same home even though the parent may not be included in the eligible unit. Applicable situations include but are not limited to:
i. Pending legal action (accidents, punitive damages, etc.)....
........
The form must be signed by each person whose signature is required on the application for assistance even though that person may not be included in the eligible unit. It must identify the source, specifically and with particularity the member(s) of the eligible unit for whom the repayment is sought, and the reason for the pending payment and the date(s) of signing. An agency employee will witness each signature. [N.J.A.C. 10:81-3.40(c) 1 and 2].
Penalty is provided for failure to comply:
When a resource (or a claim pursuant to N.J.A.C. 10:81-3.40(b)2) is applicable to a parent and the parent fails or refuses to cooperate in its liquidation (or to sign an Agreement to Repay), the entire family will be ineligible for assistance. [N.J.A.C. 10:81-3.38(b)1].
In a limited number of instances an agreement to repay is not necessary:
1. Assistance other than AFDC money payments:
i. Agreements to Repay are not to be used in the Medicaid Only and Medicaid Special programs.
2. Benefits protected by law: The Agreement to Repay is not to be used when the pending payment arises from potential entitlement to:
i. RSDI, SSI, Railroad Retirement, Veteran's benefits, Workers' Compensation, Temporary Disability through the N.J. Department of Labor or term life insurance.
ii. Payment to a child and only to a child for personal injury to the child. [N.J.A.C. 10:81-3.40(d)].
When a valid agreement exists, the County Welfare Board may take the following action:
Upon liquidation of a claim or interest for which a valid Agreement to Repay exists (see N.J.A.C. 10:81-3.40(c)), regardless of whether or not the persons involved are receiving assistance at the time, the CWA will evaluate the situation. Upon a showing that, by release of the funds and only by release of the funds, the household can reasonably [be] expected [to] remain off the assistance rolls indefinitely, the CWA may, with approval of the State office, release the funds to the household. In all other instances the CWA will, subject to the special provisions below, pursue recovery of the lesser of the following amounts:
1. The amount of cash assistance granted in the AFDC Program to or for the person(s) for whom the pending matter was applicable from the date of the *625 accident or occurrence which gave rise to the settlement to the date of payment, regardless of the date of execution of the Agreement to Repay;
2. The amount of money actually received after making allowance for costs and fees of collection, medical payments made as a result of the accident or occurrence giving rise to the client's recovery, identifiable future medical expenses properly due from the proceeds and, deducting at the discretion of the CWA, up to $500.00 for miscellaneous related expenses (see N.J.A.C. 10:82-3.2(b)9).
i. The amount of assistance paid on behalf of an individual shall be the difference between the actual grant(s) received and the amount which would have been granted to the family if the child had not been included in the eligible unit.
........
When any settlement or part of a settlement which would have been repayable is placed in trust, the CWA shall take the position that the Agreement to Repay represents a valid claim on such funds and will pursue that claim by petition to the appropriate court. [N.J.A.C. 10:81-3.41(a) and (d)].
When no valid repayment agreement exists, action by a County Welfare Board is also clearly prescribed:
1. Upon liquidation of a resource for which a valid Agreement to Repay does not exist solely by reason of the applicant/client's withholding of information about the matter, the CWA shall pursue collection activity as in this section, indicating to those concerned, including the courts, that except for the client's withholding of information, a valid agreement would have existed or the assistance would not have been granted.
2. In any instance in which an Agreement to Repay would have been applicable but closure of the case precluded delivery of the Agreement, the CWA will determine the amount of assistance which would have been repayable under a properly executed Agreement to Repay. Based on the feasibility of collection action, it will then take such action as is appropriate.
3. Upon liquidation of a resource for which a valid agreement does not exist for any reason other than withholding of information by the client, i.e., administrative error, the CWA shall not pursue any claim but will nonetheless reevaluate current eligibility. [N.J.A.C. 10:81-3.41(e)].
The pre-1977 text of N.J.S.A. 44:10-4(a), see 1962 N.J. Laws c. 80, § 1 at 564-565, authorized recovery of benefit payments only from the date of signing of the agreement to repay rather than extending back to the date of the claim. See, e.g., Jackson, 79 N.J. at 527; In re Guardianship of Jones, 170 N.J. Super. 478, 482 (App.Div. 1979), certif. den. 82 N.J. 290 (1980). But see Jackson, 79 N.J. at 527 n. 3 ("... the 1977 amendment to the Act has made a substantial change in this provision."). *626 However, the 1977 amendment extending the statute's reach to payment entitlements, 1977 N.J. Laws c. 127, § 4, broadened the scope of a repayment agreement to include public assistance benefits paid from the date of the accident. Brinkley v. LaRoche, 178 N.J. Super. 243, 249 (App.Div. 1981); Falgiatore v. Atlantic County Department of Social Services, 175 N.J. Super. 122, 126 (Ch.Div. 1980) (Haines, J.S.C.). The purpose of the 1977 amendment is clear:
to require a person, supported by welfare monies during a time of anticipated but unrealized income, to treat the assistance monies as a loan which must be repaid when the income is realized. The arrangement satisfies the needs of the welfare recipient while protecting the public treasury. [Falgiatore, 175 N.J. Super. at 126].
The statutory provision, N.J.S.A. 44:10-4(a), empowering Boards to seek recoupment pursuant to a repayment agreement has also passed constitutional muster. The New Jersey Supreme Court has declared:
The further contention that section 4(a) is coercive and arbitrary in requiring the execution of an agreement to repay as a condition of receiving assistance under the Act is also based on social considerations. Granting that due process and equal protection extend to the receipt of welfare assistance, there are competing interests involved, and as long as the enactment strikes a fair societal balance, and a rational basis exists for the legislation, it must be upheld. The costs of welfare assistance are substantial. A state, in administering its AFDC program, cannot be faulted for husbanding its welfare resources by requiring reimbursement from those who become able to repay. [Jackson, 79 N.J. at 526].
See also Lalic v. Chicago, Burlington and Quincy Railroad Co., 263 F. Supp. 987, 989 (N.D.Ill. 1967). The New Jersey Supreme Court has also rejected any alleged right to an administrative fair hearing prior to civil action by a county welfare agency seeking recoupment:
Fair hearing procedure is designed to protect a needy person from summary administrative action which could deprive him of assistance to which he may be entitled. It has no application where, as here, the Board's action in no way impairs the right to continued assistance. Moreover, the civil action procedure affords each defendant an opportunity to be heard in a court of law thereby satisfying the requirements of due process. [Redding v. Burlington County Welfare Board, 65 N.J. 439, 447 (1974)].
*627 Several courts construing this statute have required a valid repayment agreement as a precondition of a CWA's entitlement to repayment. Essex County Welfare Board v. Hellams, 103 N.J. Super. 438, 439 (App.Div. 1968) (when public assistance was advanced for support of infant defendant out of trust fund banking account representing the net proceeds of settlement of infant's personal injury claim). See also Doughty, 160 N.J. Super. at 130; Cumberland County Welfare Board v. Rodriguez, 144 N.J. Super. 365, 373, 377 (Law Div. 1976). However, even in the absence of agreements to repay, some courts have upheld the right of a County Board to seek recoupment. In Redding v. Burlington County Welfare Board, 65 N.J. 439, 445 (1974), the Court stated:
We are here dealing with overpayments of assistance, i.e., public money paid out in excess of that permitted by law. The mere receipt of such money can be said to create an obligation to repay, akin to the common law action in assumpsit for money had and received. In such a situation, it is unnecessary for the Legislature to specify that a welfare board has the right to recover this money. As heretofore noted, such right would be inherent in the board's function unless the Legislature provides otherwise. [(emphasis in original)].
A County Board's power to so recover was
implied in the delegation of authority to administer the program. The welfare board is authorized to make payments only in amounts authorized by law. When an overpayment has been made, the public interest requires that the board have the power to seek out the recipient and recover the amount of the overpayment if the person has the means or ability to repay. The right and the power to seek to recoup benefits illegally paid, unless specifically prohibited, is inherent in the delegation of authority to administer the program. [Ibid.]
Nonetheless, recent cases highlight the continuing controversy. In Terry v. Harris, 175 N.J. Super. 482 (Law Div. 1980), the court confronted the issue of whether there exists authority to recover welfare payments from proceeds of a tort claims judgment where the recipient simply and continually refuses to sign the repayment agreement. The court relied on N.J.A.C. 10:81-3.41(e)(1) (effective 1979) (text quoted above) which it considered to "supplement[] the pertinent [1977] statute in such a way as to make more consistent the utilization of an agreement to repay and more efficacious its use as a means for *628 effectuating recoupment." 175 N.J. Super. at 497. The court opined:
there is no logical reason to reward a welfare recipient who refuses, willfully or otherwise, to disclose a pending lawsuit from not having to repay welfare assistance, whereas those welfare recipients who comply with the spirit and intent of the AFDC program are penalized because when they do so they are required to sign an agreement to repay or their assistance is terminated. [Id. at 498].
But in Reed v. Slaughter, 213 N.J. Super. 123 (Law Div. 1986), the court ruled that "in the absence of an executed agreement, where there has been full disclosure of the personal injury action, the Welfare Board has no claim." Id. at 132. The court read N.J.S.A. 44:10-4(a) as creating no lien
upon funds of the welfare recipient. It is only the execution of a reimbursement agreement which entitles the Board to repayment. [Id. at 126].
Thus, it held that without an executed "reimbursement" agreement (as the court consistently describes this instrument) or in the absence of statutory authority, the Welfare Board may not pursue reimbursement efforts. Terry was distinguished "because here there was not only no concealment, but explicit notification of the pendency of the law action without any request on the part of the welfare board for a reimbursement agreement." Id. at 131.
We consider the Terry holding to be correct, and reject the Reed opinion. The Reed court failed to recognize Redding's basis for permitting recoupment. The recovery of overpayment to which Redding refers is the recoupment of public monies "paid out in excess of that permitted by law." Redding, 65 N.J. Super. at 445 (emphasis in original). These excess public monies are not received under statutory entitlement. This gives rise to a common law right of recoupment on the part of the County Board and an obligation of repayment on the part of the client.
We conclude that with or without the agreement, Stanley was subject to the CWA's recoupment of public assistance benefits paid to her since the date of her accident, the point at which she became entitled to any tort recovery. We view post-accident *629 benefit payments as monies only conditionally paid and which must be returned to the Board in the event of a third-party recovery by the recipient. The effect of Stanley's signing the agreement is simply to satisfy a condition of continuing eligibility to receive benefit payments. The requirement of executing an agreement to repay does not impair any right requiring a fair hearing as it is merely an acknowledgment by the recipient of the conditional nature of the payments.
Contrary to the trial court's assertion, the repayment agreement is not an unenforceable contract by reason of adhesion, vagueness or unequal bargaining positions. "[A] contract is a voluntary obligation proceeding from a common intention arising from an offer and acceptance." Johnson & Johnson v. Charmley Drug Co., 11 N.J. 526, 539 (1953). See also Friedman v. Tappan Development Corp., 22 N.J. 523, 531 (1956). It is reasonable to conclude that this repayment agreement constituted a contract, expressing the client's agreement to repay in consideration for the Board's maintenance of the client's continuing eligibility to receive benefit payments on a loan type basis. See N.J.S.A. 44:10-4(a). Inasmuch as the legitimacy of a standardized contract alleged to be adhesive is judged "entirely on its compliance with standards in the public interest ...," Vazquez v. Glassboro Service Association, 83 N.J. 86, 104 (1980) (quoting Slawson, Standard Form Contracts and Democratic Control of Lawmaking Power, 84 Harv.L.Rev. 529, 566 (1971)), the repayment agreement is not an unenforceable adhesion contract. The public has a significant interest in ensuring that disbursement of benefit payments to which an individual is not statutorily entitled is continued only on condition of repayment. Any objection based on disparity of bargaining position, cf. Spring Motors Distributors, Inc. v. Ford Motor Co., 98 N.J. 555, 576 (1985), may be overcome by the need to protect the public interest. Simply put, the State is not in the commercial enterprise of retail credit. The State certainly may not ignore its responsibility to pursue recovery means which do "not diminish present or future AFDC grants below *630 actual need." Redding, 65 N.J. at 444. But the aim of the repayment agreement is to extend eligibility in order to allow AFDC grants to continue; termination is effected only upon the client's voluntary refusal to sign.
The grammatical or textual problems in the repayment agreement would not be sufficient to defeat recoupment in light of the trial court's own finding of Stanley's intelligence and understanding of the agreement. It is not appropriate to invoke the provisions of the Plain Language Act, N.J.S.A. 56:12-1 et seq., which by its own "simple, clear, understandable and easily readable ..." terms, N.J.S.A. 56:12-2, applies only to consumer contracts, not a proper classification of this statutorily prescribed repayment agreement.
The trial court's statement that Stanley would have been better off if she had known to terminate benefits by refusing to sign is premised on the belief that Stanley had meaningful alternatives to signing. For instance, the trial court cites her rights to a compromise and to a retention for anticipated medical expenses or of monies constituting the damage award. None of these alleged "rights" are forsaken by signing, which is merely a condition of continuing eligibility. Stanley can exercise such options upon the Board's demand for recoupment after the damage award, or in this case the settlement monies, are made available.
Moreover, there is no constitutional violation here. The trial court's reliance on Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) and Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) is misplaced as these cases deal with the termination of public benefits to which the recipient was unconditionally statutorily entitled. Statutory authority for the repayment agreement has been found fully constitutional by the New Jersey Supreme Court. Jackson, 79 N.J. at 526. Thus, if Stanley had refused to sign, benefits would have terminated only after notice and hearing requirements consonant with due process. Any subsequent *631 suppression of benefits must satisfy these same due process requirements. N.J.A.C. 10:81-7.1(k) and 2.6(b) and (d). In addition, the Board's ultimate demand for recoupment is subject to due process requirements which are satisfied by the judicial process. Redding, 65 N.J. at 447. Here, the subsequent suspension of Stanley's benefit payments triggered a right of review and the Board's notification of suspension included notice of her right to appeal at a fair hearing in conformity with N.J.A.C. 10:81-7.1(k) and 2.6(b) and (d), of which Stanley apparently did not avail herself. The denial of any compromise settlement after meeting with Stanley's counsel does not run afoul of constitutional safeguards. Under N.J.S.A. 44:10-4(c), compromise action is entirely discretionary.
The judgment of the Law Division is reversed and the matter is remanded to the trial court for further proceedings as may be necessary to finalize the Board's claim.