BETTY REED, PLAINTIFF–RESPONDENT, v. JOHN SLAUGHTER, CONSTANCE SLAUGHTER, AND SLAUGHTER'S BETTER CLEANERS, AND STATE OF NEW JERSEY, DEPARTMENT OF HUMAN SERVICES, DEFENDANTS, AND COUNTY OF ESSEX, DIVISION OF WELFARE, DEFENDANT–APPELLANT.

Argued January 20, 1988—Decided June 9, 1988.

*Alan C. Stephens,* Assistant County Counsel, argued the cause for appellant (*H. Curtis Meanor,* Acting County Counsel, attorney).

*Norman A. Maranz* argued the cause for respondent.

*Susan R. Oxford,* Assistant Deputy Public Advocate, argued the cause for *amicus curiae,* Public Advocate of New Jersey (*Alfred A. Slocum,* Public Advocate, attorney; *Susan R. Oxford* and *Shirley Brandman,* Assistant Deputy Public Advocate, on the brief).

PER CURIAM.

We have determined to affirm, without extended discussion, the judgment below. The case presents only what we might ordinarily call a situation not requiring our appellate supervision. *Mahony v. Danis,* 95 *N.J.* 50 (1983).

This case concerns not the power of government to protect the public fisc from unworthy recipients of welfare, but rather the validity of a regulation's interpretation, concurred in by the agency primarily responsible for the implementation of the welfare program. The facts are set forth in the reported opinion of the Law Division, 213 *N.J.Super.* 123, 124–26 (1986). That judgment was affirmed by the Appellate Division on the basis of the opinion below. 217 *N.J.Super.* 214 (1987).

The issue stems from the administrative oversight of a county welfare agency that failed to obtain a written agreement to repay AFDC (Aid to Families of Dependent Children) benefits from a pending tort claim. Betty Reed, who had been receiving AFDC benefits, dutifully informed the agency that she had been injured in an accident and was pursuing a claim for damages. When the $25,000 proceeds of the available insurance coverage were deposited into court, the court had to evaluate various claims including one claim for $7,930 in Medicaid benefits and the claim at issue, for reimbursement of $13,805 in AFDC benefits. The defendant County welfare agency refused to consider Reed's proposal for a structured settlement that would postpone (albeit for an extended period), but not avoid, reimbursement of the AFDC advances. The County's inflexible insistence on full and immediate reimbursement would have effectively left Reed with no compensation for her personal injuries. The Law Division found that the absence of a written reimbursement agreement precluded recovery of the AFDC benefits from the tort claim proceeds.

Under *N.J.S.A.* 44:10-4(a), parents or relatives who, like Reed, receive public assistance for children living with them may be required, as a condition of their continued eligibility, to agree to repay from the settlement of certain legal claims or interests the assistance granted by the county welfare agency from the date of their entitlement to such claims or interests. However, this provision does not perforce preclude the recovery of such funds in the absence of an agreement to repay. We are satisfied nevertheless that the administrative regulation adopted by the New Jersey Department of Human Services leads to the conclusion that in the circumstances of this case, the absence of the agreement should have precluded the reimbursement.

That regulation, *N.J.A.C.* 10:81-3.41(e), sets forth the specific circumstances in which recovery may be had against a welfare recipient in the absence of an agreement to repay.

Those circumstances include untimely closure of the case or the claimant's withholding of information. The county welfare agency cannot pursue a claim for repayment, but can reevaluate a client's current eligibility, when that client has received payments that for any reason other than the client's withholding information are not covered by a repayment agreement. *N.J.A.C.* 10:81–3.41(e)3. In this case, however, the County welfare agency acknowledged that plaintiff continually cooperated and promptly notified the agency of the resource.

The Department of Human Services, which has the greater financial and administrative interest in the AFDC program (we were informed at oral argument that benefits are paid one-half by the federal government, three-eighths by the State, and one-eighth by the county), does not dispute that in the absence of "peculiar facts" the above is the correct interpretation of its regulation. Moreover, in withdrawing its petition to review the judgment below the Department has informed the Court that the Appellate Division's decision below, precluding recovery without a repayment agreement, is "completely distinguishable" from its decision in *Burlington Welfare Bd. v. Stanley,* 214 *N.J.Super.* 615 (1987) (even without repayment agreement, county had common-law right of recoupment from proceeds of tort claim judgment of public assistance benefits paid since date of accident). In essence, the State disagrees with the County's "flat contention that no repayment agreement is required."

The Department of Human Services, the agency of government primarily required to administer the legislative program, has implemented that program through a comprehensive regulatory structure that specifies when a written agreement shall be required as a condition of reimbursement of AFDC benefits. We thus have no occasion to debate whether, in the absence of such an agreement, the agency has the inherent power to require repayment. A brief addition to the regulation could well resolve the issue posed by the dissent.

The judgment of the Appellate Division is affirmed.

HANDLER, J., dissenting.

The facts of this case are basically undisputed. On February 15, 1983, plaintiff, Betty Reed, slipped and fell on a sidewalk in front of premises owned by defendants John Slaughter and Constance Slaughter, not parties to the present appeal. A suit to recover for personal injuries was filed by plaintiff against the Slaughters on November 19, 1983.

At the time that the suit was filed Reed was a recipient of Medicaid payments, and of public assistance under the Assistance for Dependent Children program, *N.J.S.A.* 44:10–1 to –8. She continued receiving this assistance during part of the period that her lawsuit was pending. Although being informed of this suit, the Essex County Division of Welfare (the "Board" or "Welfare Board") never asked Reed to execute a reimbursement agreement. Instead, it simply sent notice asserting a lien on the proceeds of the suit to the extent of any welfare payments made during the pendency period.

On January 30, 1986, Reed voluntarily withdrew from the assistance rolls. She had received $13,805.00 in welfare payments and $7,930.58 in Medicaid payments between that date and the date of her accident.

The Board joined this action in response to a motion by Reed seeking approval of a structured settlement. As analyzed by the trial court, *Reed v. Slaughter*, 213 *N.J.Super.* 123 (Law Div.1986), under this plan

> it [was] ... proposed on behalf of plaintiff to pay immediately out of this sum $8,800 for legal fees and costs, and to put the balance in trust, with provision that nothing be released to plaintiff for a fixed period of at least ten years. If the fund were held for 20 years, the amount available to plaintiff would [have] be[en] approximately $83,000. If the sums received from welfare and Medicaid were paid at that time *without interest,* plaintiff would be left with approximately $60,000. If the welfare board and Medicaid were paid at once, after counsel fees, ... nothing would be left to plaintiff.
>
> [*Id.* at 125 (citations omitted).]

The Board requested the court to deny the relief desired by Reed and asked for reimbursement of the amounts paid to her. At this point the Board was acting under the impression that

Reed had signed a properly executed Agreement to Repay assistance as called for by *N.J.A.C.* 10:81–3.40, 3.41. Only later did it discover that no such agreement existed and that the Reed had not been requested to execute one before assistance had been terminated.

After hearing argument on the motion, the trial court ruled on June 6, 1986, that the Medicaid claim had to be paid out of the proceeds of the damages award pursuant to *N.J.S.A.* 30:40–7.1. *Reed, supra,* 213 *N.J.Super.* at 126. However, with regard to the welfare payments, the court held that the Board had no valid claim to this money due to the agency's failure to obtain a signed agreement to repay despite the fact that the Board was given proper notice of the suit. *Id.* at 132. In an unpublished *per curiam* opinion the Appellate Division affirmed this holding substantially for the trial court's reasons. On June 26, 1987, we granted the Board's petition for certification.

## I.

At common law it has generally been accepted that in the absence of fraud there is no right of public recovery of relief payments. *See, e.g., Los Angeles County v. Security First Nat'l Bank,* 84 *Cal.App.*2d 575, 191 *P.*2d 78 (1948); *City of Albany v. McNamara,* 117 *N.Y.* 168, 22 *N.E.* 931 (1889); 81 *C.J.S., Social Security,* § 122 at 236; Graham, "Public Assistance: the Right to Receive; the Obligation to Repay," 43 *N.Y.U.L.Rev.* 451, 478–79 (1968). The Social Security Act, 42 *U.S.C.A.* §§ 301–1396, was virtually silent on the matter, and its advent in 1935 did not have a direct impact on this general rule. Nevertheless, "it has been suggested that Congress implicitly acquiesced to state recoupment laws....", Note, Social Welfare, 28 *Rutgers L.Rev.* 515, 517 n. 23 (1974), *quoted in Burlington County Welfare Bd. v. Stanley,* 214 *N.J.Super.* 615 (App.Div.1987), by providing for federal sharing of the proceeds resulting from any such efforts. Thus, in the context

of the Social Security Act's Aid to Families with Dependent Children (AFDC) program, 42 *U.S.C.A.* §§ 601 to 615, there is a specific provision reducing federal AFDC contributions to states to reflect the pro-rata share of any amounts recovered. 42 *U.S.C.A.* § 603(b)(2); *see In re Estate of Jackson*, 79 *N.J.* 517, 523 (1979) (discussing anticipation by federal AFDC scheme of state recoupment efforts).

The substantive law in this matter originates in the State statute governing the AFDC program in New Jersey, *N.J.S.A.* 44:10–1 to –8, and its recoupment provision, *N.J.S.A.* 44:10–4(a). This provision, amended by *L.*1985, *c.* 120, § 1 in a manner not affecting this case, currently reads as follows:

Whenever any parent or relative with whom a child is living applies for or is receiving assistance for such child pursuant to this act, and it appears that there is pending entitlement to a payment to the child or to either or both his parents of funds arising from a claim or interest legally or equitably owned by such child or by either or both his parents [other than that portion of a personal injury award which a court specifically awards to a child to make him whole as a result of an injury,] the county welfare agency may, as a condition of eligibility or continuation of eligibility for such assistance, require such parent or parents, or relative, to execute a written promise to repay, for the funds anticipated, the amount of assistance to be granted from the date of entitlement to such payment. Upon any refusal to make repayment, including refusal by any person acting for or on behalf of such parent or parents, or relative, in accordance with such promise, the county welfare agency may take all necessary and proper action under the laws of this State to enforce such promise, and the granting and continuing of assistance, as the case may be, shall be deemed due consideration therefor. Any payments from the settlement of such claim or interest legally or equitably owned by such child or by either or both of his parents made by any person acting for or on behalf of such parent or parents, or relative, subsequent to notice of claim of the county welfare agency and prior to express written approval by the county welfare agency shall cause such person to be liable to the county welfare agency in the amount of such payment.

[*Id.* (bracketed provisions added by 1985 amendment).]

This statute includes "a cause of action to recover in tort for personal injuries . . ." within the meaning of a claim of interest legally or equitably owned. *Stanley, supra,* 214 *N.J.Super.* at 623 (quoting *Francis v. Harris,* 100 *N.J.Super.* 313, 318 (Law Div.), aff'd, 103 *N.J.Super.* 440 (App.Div.1968), cert. den, 53 *N.J.* 227 (1969)); *see Jackson, supra,* 79 *N.J.* at 524; *In re*

*Doughty*, 160 *N.J.Super.* 126, 128–29 (App.Div.), cert. granted, 78 *N.J.* 409 (1978), cert. dismissed, 81 *N.J.* 261 (1979).[1]

The Public Assistance Manual, *N.J.A.C.* 10:81, provides the regulatory framework for implementing the recoupment provision. This specifically orders that "[r]epayment of assistance in the AFDC program (all segments) is required in certain cases in which assistance is granted while the recipient(s) awaits receipt of funds from some other source." *N.J.A.C.* 10:81–3.40(b)(2). The mechanism for receiving this repayment is through use of an "Agreement to Repay" [occasionally referred to as "Agreement"]. Such Agreements

must be signed by each person whose signature is required on the application for assistance even though that person may not be included in the eligible unit. It must identify the source, specifically and with particularity the member(s) of

---

[1]In *Jackson, supra,* 79 *N.J.* 517, this Court directly addressed the State's recoupment of public assistance payments and found it to be constitutionally permissible. *See generally* Annotation, "Personal Injury Recovery as Affecting Eligibility for, or Duty to Reimburse, Public Welfare Assistance," 80 *A.L.R.*2d 772, 790–796 (discussing constitutionality of recoupment statutes). This conclusion was based on the rationale that:

Granting that due process and equal protection extend to the receipt of welfare assistance, there are competing interests involved, and as long as the enactment strikes a fair societal balance, and a rational basis exists for the legislation, it must be upheld. [*Jackson,* 79 *N.J.* at 526.]

A rational basis exists for recoupment efforts. As the *Jackson* court noted, *ibid.,* "[t]he costs of welfare are substantial. A state, in administering its AFDC program, cannot be faulted for husbanding its welfare resources by requiring reimbursement from those who become able to pay." If anything, the costs of welfare are greater now than they were when the Court made that declaration. In fiscal year 1985–86 the net assistance expenditures for the entire AFDC program were over four-hundred and eighty million dollars. New Jersey Dep't of Human Services, "Exhibit 3: Annual Report 1985–1986," *Public Welfare Statistics September 1986* (June 8, 1987). Nor is this figure stabilizing—the "C" segment of AFDC alone has increased approximately 3% yearly from 1984 to 1986. *Id.,* "Exhibit 1: Selected Statistics, Public Assistance Program, Fiscal Years 1984, 1985, 1986." Thus there is strong justification for the State's implementation of recovery mechanisms and therefore the reasoning behind *Jackson* still applies today in finding constitutional approval for the recoupment provision. *See Stanley,* 214 *N.J.Super.* at 626, 630–31 (noting *Jackson* and finding no constitutional flaw in welfare recoupment since any due process requirements are satisfied by judicial review).

the eligible unit for whom the repayment is sought, and the reason for the pending payment and the date(s) of signing. An agency employee will witness each signature.

[*N.J.A.C.* 10:81–3.40(c)(2).]

The rules regarding the Agreements mandate that

[t]he receipt by the CWA [county welfare agency] of a signed Agreement to Repay is required as a condition of eligibility whenever, and only whenever, there appears to be entitlement to a specifically identified payment other than public assistance to any persons for whom cash assistance in AFDC is being requested or granted [except under several circumstances not relevant to this case].... For this purpose, a parent's potential entitlement is considered to include potential entitlement by that parent's minor children who live in the same home even though the parent may not be included in the eligible unit. Applicable situations include but are not limited to:

i. Pending legal action (accidents, punitive damages, etc.); ...

[*N.J.A.C.* 10:81–3.40(c)(1).]

On any recovery by the welfare client the Agreements to Repay are then used to recoup any amounts of money reflecting public assistance payments that remain after making allowance for litigation costs, present and foreseeable medical costs, and miscellaneous expenses to a limited extent. *N.J.A.C.* 10:81–3.41(a)(2). Pursuant to authorization under the 1977 amendments of the Act, *L.*1977, *c.* 127, § 4, the amount recovered is based on the amount paid "from the date of the accident or occurrence which gave rise to the settlement to the date of payment, regardless of the date of execution of the Agreement to Repay ..." *N.J.A.C.* 10:81–3.41(a)(1); *see Brinkley v. La-Roche,* 178 *N.J.Super.* 243, 149 (App.Div.1981); *Falgiatore v. Atlantic City,* 175 *N.J.Super.* 122, 126 (Ch. Div.1980); *see also Jackson, supra,* 79 *N.J.* at 527 n. 3. (ruling based on pre–1977 statute but noting substantial changes made by the 1977 amendment). The Public Assistance Manual also provides that where a claim pursuant to *N.J.A.C.* 10:81–3.40(b)(2) is applicable to a welfare client and that client "fails or refuses to cooperate in its liquidation (or to sign an Agreement to Repay), the entire family will be ineligible for assistance." *N.J.A.C.* 10:81–3.-38(b)(1).

In the context of this case, the most disputed portion of the Public Assistance Manual is that which deals with situations

when an Agreement to Repay has *not* been signed. *N.J.A.C.* 10:81–3.41(e) provides three means for responding to such situations:

> 1. Upon liquidation of a resource for which a valid Agreement to Repay does not exist solely by reason of the applicant/client's withholding of information about the matter, the CWA [county welfare agency] shall pursue collection activity as in this section, indicating to those concerned, including the courts, that except for the client's withholding of information, a valid agreement would have existed or the assistance would not have been granted.
>
> 2. In any instance in which an Agreement to Repay would have been applicable but closure of the case precluded delivery of the Agreement, the CWA will determine the amount of assistance which would have been repayable under a properly executed Agreement to Repay. Based on the feasibility of collection action, it will then take such action as is appropriate.
>
> 3. Upon liquidation of a resource for which a valid agreement does not exist for any reason other than withholding of information by the client, i.e., administrative error, the CWA shall not pursue any claim but will nonetheless reevaluate current eligibility.
>
> [*N.J.A.C.* 10:81–3.41(e).]

The inquiry, therefore, is whether these provisions provide for a means by which the Board can recoup its payments despite the absence of a signed agreement.

## II.

The starting point for determining whether an Agreement to Repay is a required condition for the State to be able to recoup benefits is an examination of *N.J.A.C.* 10:81–3.41(e). Since "[i]t is well established as the law in this State that an administrative agency is considered a minor legislative body when dealing with proposed regulations under a grant of power," *Terry v. Harris*, 175 *N.J.Super.* 482, 495 (Law Div.1980) (citing *Consolidation Coal Co. v. Kandle*, 105 *N.J.Super.* 104 (App.Div.), aff'd, 54 *N.J.* 11 (1969)), then to the extent that this regulation applies to the situation at hand and does not narrow or restrict the controlling statute it will be entitled to deference. *See Malone v. Civil Service Comm'n*, 80 *N.J.* 129, 137 (1979).

A number of New Jersey cases have interpreted this provision of the administrative code as requiring that an Agreement be signed after the tort cause of action arose in order for the

State to be able to recover anything. *See Essex County Welfare Bd. v. Hellams,* 103 *N.J.Super.* 438 (App.Div.1968) (obligation to repay is contingent on execution of written promise to do so during pendency of tort action); *Cumberland County Welfare Bd. v. Rodriquez,* 144 *N.J.Super.* 365 (Law Div.1976) ("If such agreement is not signed, there can be no recovery by the welfare board for assistance granted while the claim is pending."). In addition, courts have held that these agreements must be narrowly drawn. Thus, in *Rodriquez, supra,* 144 *N.J.Super.* at 374–82, the court limited the Agreement to Repay to its precise terms and held that it would not be enforceable if vaguely written or not understood when signed, or if signed in blank before the cause of action for which the claim arose occurred.

In contrast to these decisions are the holdings in three other cases that do permit state recovery despite the absence of a signed agreement: *Redding v. Burlington County Welfare Board,* 65 *N.J.* 439 (1974); *Stanley, supra,* 214 *N.J.Super.* 615, *Terry, supra,* 175 *N.J.Super.* 482.

Of these three cases, the *Terry* decision is the one most easily distinguished from the apparent anti-recoupment position of *Hellams* and *Rodriquez.* This case involved a welfare recipient who failed to disclose the existence of her lawsuit when asked if she had any such actions pending. Because of this failure the court reasoned that "the conclusion is inescapable that the pertinent information was 'withheld' by her," and that it was "clearly" the case that as a result, *N.J.A.C.* 10:81–3.41(e)(1)'s permission to pursue collection activity despite the lack of an Agreement was "both pertinent to the facts of this case and is also satisfied hereunder." *Terry, supra,* 175 *N.J.Super.* at 494–495. Thus, as the trial court in this case pointed out, 213 *N.J.Super.* at 131, the situation in the present matter is clearly different since there was explicit notification given to the Board of the pending action without any corresponding request on its part for a reimbursement agreement. "In order to reach the result that the welfare board had a lien upon the proceeds of

the settlement, the judge in *Terry* had to come to the conclusion that there was a species of misrepresentation or fraud on the part of the recipient. There is nothing of the kind in this case." *Ibid.*

More directly opposed to the *Hellams–Rodriquez* outcome was the decision in *Stanley, supra,* 214 *N.J.Super.* 615. This case dealt with a woman who had at first lied about the pendency of her lawsuit but later signed an Agreement to Repay. In its opinion, which primarily analyzed the validity of reimbursement agreements, the court concluded "that with or without the agreement, [the welfare client] ... was subject to the [Board's] ... recoupment of public assistance benefits paid to her since ... the point at which she became entitled to any tort recovery." *Id.* at 615. The court's rationale for this conclusion was its "view [of] post-accident benefit payments as money only conditionally paid and which must be returned to the Board in the event of a third-party recovery by the recipient." *Id.* at 628–29.

Under the *Stanley* reasoning Agreements to Repay are signed "simply to satisfy a condition of continuing eligibility to receive benefit payments," *id.* at 629, and so *N.J.A.C.* 10:81–3.-41(e)(3) is presumably limited to actions taken against continuing welfare clients. In this scheme, *N.J.A.C.* 10:81–3.41(e)(2) is used to determine any amount "which would have been repayable under a properly executed Agreement to Repay," *ibid.,* and *former* welfare clients are then sued to pay this amount whenever "closure of the case precluded delivery of the Agreement," *ibid.,* no matter what the reasons for this preclusion were—*i.e.,* even if resulting from administrative error. While the welfare board would not pursue any claim against *continuing* welfare clients, even if resulting from administrative error, it would not be prejudiced because after reevaluating current eligibility, it would use *N.J.A.C.* 10:81–3.41(e)(3) to reduce future benefits to reflect, and thus indirectly recoup, the nonrecovered amount.

This interpretation of the administrative code is supported by the provision of *N.J.S.A.* 44:10-4(a) that a "county welfare agency *may*, as a condition of eligibility or continued eligibility for such assistance, require [parties] ... to execute a written promise to repay[.]" (emphasis added). This may fairly be read as simply empowering Boards to deny eligibility to clients who refuse to sign Agreements. It thus acknowledges or recognizes implicitly that the Boards have a power of recoupment. Under this rationale the Agreements would act (1) as a means of accelerating any eventual suit by a Board by giving it a lien on the money so that the Board is protected against any attempt to divert the proceeds; (2) as notification to the welfare clients that any future benefits received during the pendency period are subject to recoupment; and (3) as determining the basis for recovery in any such collection suit. The Agreements thus would not be a necessary condition for a successful recoupment.

Interpreted in this fashion the Public Assistance Manual covers all possible recoupment situations. It enables Boards informed of the pendency of an ongoing welfare client's lawsuit to require the client to sign an Agreement to Repay or else face a cut off in eligibility. *N.J.A.C.* 10:81-3.38(b)(1). If the client goes off the welfare rolls before informing the Board of a pending entitlement during a period when receiving assistance, it gives the Board a claim against that party for the amounts it had provided from the time the cause of action arose to the date when the client went off welfare. *N.J.A.C.* 10:81-3.41(e)(2). If the client remains on the welfare rolls but "for any reason other than withholding of information" does not sign an Agreement before settling or winning the lawsuit, it provides the Board with the ability to reevaluate eligibility and lower future amounts received to reflect the existence of this new resource. *N.J.A.C.* 10:81-3.41(e)(3). Finally, if a present or former client withholds information about a pending entitlement, it permits the Board "to pursue collection activity as in ... [the Repayment] section," *i.e.*, treat the client as if an Agreement to

Repay had been signed resulting in a lien on the entitlement. *N.J.A.C.* 10:81–3.41(e)(1); *see Terry, supra,* 175 *N.J.Super.* at 482.

This analysis is further supported by the provision in *N.J.S.A.* 44:7–19, which declares that the State may bring "appropriate action in any court of competent jurisdiction to recover any sum of money due for assistance given any person under this chapter against such person or against any other persons chargeable by law for support of such person." The trial court in this case, 213 *N.J.Super.* at 132, reasoned that this provision does not apply to AFDC programs, because it is located within the "Old Age and Personal Disability" section of the welfare statute and therefore "limited to situations arising thereunder." In addition, it determined that even if the provision had wider applicability, its reference to "money *due* " (emphasis added) means that it must be limited to situations where the statute elsewhere provides an existing obligation to repay—and thus does not apply in this case since, under its view, no such obligation exists in the absence of an Agreement to Repay. *Ibid.*

The *Reed* analysis has two flaws. First, *N.J.S.A.* 44:10–2 mandates that the AFDC program "be administered in accordance with and governed by requirements, conditions, limitations and procedures similar to those established by [sections of *N.J.S.A.* 44:7 including 44:7–19] ..." Thus the fact that this provision is in the "Old Age and Personal Disability" section does not restrict its application in the AFDC context. Secondly, while the *Reed* analysis of the "money due" language is indeed correct, this in no way bars *N.J.S.A.* 44:7–19 from applying in this case if one reads *N.J.S.A.* 44:10–4 (the Agreement to Repay provision), as interpreted by *N.J.A.C.* 10:81–3.41(e)(2) (the repayment clause for former welfare clients), to result in a statutorily authorized obligation to repay in cases such as this.

In *Redding, supra,* 65 *N.J.* 439, this Court held that there is a common-law obligation of repayment for overpayments of

AFDC benefits, "provided the method of recovery does not diminish present or future AFDC grants below actual need." *Id.* at 444. In reaching this conclusion, we reasoned that:

While *N.J.S.A.* 44:10–1 *et seq.* does not specifically provide for the recovery of overpayments of AFDC assistance, such power must be implied in the delegation of authority to administer the program.... When an overpayment has been made, the public interest requires that the board have the power to seek out the recipient and recover the amount of the overpayment if the person has the means or ability to repay. The right and the power to seek to recoup benefits illegally paid, unless specifically prohibited, is inherent in the delegation of authority to administer the program. [*Id.* at 445.]

We went on, however, to differentiate overpayment situations from the reimbursement context. Thus, we held that it would be valid to reason that specific legislative authorization would be required "if the welfare board were attempting to secure reimbursement of AFDC grants of assistance." This, we said, "would be a matter of policy which the Legislature would have to establish before a welfare board could act." *Ibid.* In addition, we specifically stated that there would be no right to recoup overpayments when these result from administrative error. *Id.* at 446.

The *Redding* decision can be effectively distinguished so as not to bar recovery efforts such as pursued in this case. It dealt with overpayments due to unreported income and "was not concerned with pending civil suits when it spoke of 'income'." *Terry, supra,* 175 *N.J.Super.* at 491. Thus *Redding*'s bar against reimbursement of benefits in the absence of specific statutory authority was meant only to prevent the State from forcing an individual to use current income to reimburse the State for totally *unrelated* benefits granted in prior years. It was not meant to bar reimbursement by the State from an individual who receives resources that relate back to the period when benefits were granted—such as the receipt of funds from a tort judgment reflecting a cause of action that arose during the period that the individual received assistance.

The cases opposing the power to recoup benefits without first securing an Agreement to Repay do not provide powerful

arguments in their favor. The keystone to these decisions is the holding in *Hellams, supra,* 103 *N.J.Super.* at 439, which affirmed a trial court ruling against permitting a welfare board to recoup benefits "solely on the ground that the ... Board did not obtain a written promise to repay ..." The courts that followed *Hellams* took this declaration as an axiom and then concentrated only on whether or not a particular form of Agreement was valid. Thus, *Rodriquez, supra,* 144 *N.J.Super.* at 374, looked only to whether Agreements must be precise and timely, while *Brinkley, supra,* 178 *N.J.Super.* 243, *Doughty, supra,* 160 *N.J.Super.* 126, and *In re Estate of Black,* 160 *N.J.Super.* 122 (App.Div.1978), looked only to the question of whether an Agreement would apply to the period before its signing. Hence, *Hellams* and the cases that followed it share in the infirmity of failing to analyze the propriety of requiring that Agreements be signed.

The *Hellams* appellate opinion does not deepen or extend the trial court's analysis. Neither court examined or analyzed the statute or code beyond simply declaring that *N.J.S.A.* 44:10-4 required an Amendment. That analysis, however, is suspect. The case involved a welfare recipient who was not going to be removed from the assistance rolls as a result of his tort suit recovery. *Essex Co. Welfare Bd. v. Hellams,* 98 *N.J.Super.* 181 (Cty.Ct.1967). That situation is distinguishable from this case. The *Hellams* result is sustainable since Agreements are indeed required where a welfare client continues to receive assistance. *See* discussion, *supra* at 492. They are not required, however, when the party is no longer a welfare recipient as here. Thus, *Hellams* does not disagree with the analysis detailed above because it deals with a fact pattern that is sufficiently different to affect the outcome.

### III.

In sum, *N.J.S.A.* 44:10-4 provides statutory authorization for the recoupment sought in this instance. *N.J.S.A.* 44:10-4 is

intended to provide a comprehensive recoupment scheme. This is evidenced by the retroactive applicability of Agreements to Repay to the date when a cause of action arose, *supra*, at 488, as well as by the State's ability to treat situations where Agreements were not made because of the withholding of information as if an Agreement had been made, *see Terry*, 175 *N.J.Super.* 482. It follows that *N.J.A.C.* 10:81–3.41(e)(2) must be interpreted as a statutorily based authorization for Boards to undertake "collection actions" or lawsuits whenever the closure of a client's case, *i.e.*, his termination from the welfare rolls, results in the Board being unable to force him to sign an Agreement to Repay.

For these reasons I conclude that the majority is mistaken in its adoption of the trial court's analysis. I would reverse the judgment below. Therefore, I dissent.

*For affirmance* —Chief Justice WILENTZ and Justices CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For reversal* —Justice HANDLER—1.

